IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JAMES KYLE TINDOL, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:13-CV-92-WKW |
| | ) | [WO] |
| ALABAMA DEPARTMENT OF | ) | |
| REVENUE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff James Kyle Tindol, a State of Alabama Merit System employee, sues his employer, Defendant Alabama Department of Revenue ("ADOR"), the ADOR Commissioner, Julie Magee, the Alabama State Personnel Department ("SPD"), and SPD's Director, Jackie Graham, for alleged violations of his federal constitutional rights to equal protection and procedural due process, and for negligence and breach of contract under Alabama law. As Mr. Tindol sees things, Ms. Magee unjustly denied him a recommended promotion for which he was qualified, and Ms. Graham denied him a hearing concerning the wrongful non-promotion. Defendants' stance is that Mr. Tindol had no legally cognizable right to a promotion within the Merit System and, under the circumstances, no right to a hearing concerning his non-promotion.

Before the court are motions for summary judgment filed by ADOR and Ms. Magee in her official capacity (Docs. # 30, 31), Ms. Magee and Ms. Graham in their individual capacities (Docs. # 32, 33, 39, 40), and SPD and Ms. Graham in her official capacity.  (Docs. # 34, 38).  Those motions have been fully briefed. (Docs. # 47, 48, 50.)  Mr. Tindol has also filed a motion for partial summary judgment on his procedural due process claim (Docs. # 35, 36, 37), which has also been fully briefed (Docs. # 45, 46, 49).  Also pending is Defendants' collective objection and motion to strike Mr. Tindol's contentions in the proposed pretrial order (Docs. # 58, 64).

Upon careful consideration of the parties' arguments, the evidence, and relevant law, the court concludes that Defendants' motions for summary judgment are due to be granted, Mr. Tindol's motion for partial summary judgment is due to be denied, and Defendants' objections and motion to strike are due to be overruled as moot and denied as moot, respectively.

## I.  JURISDICTION AND VENUE

The court exercises subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.  Personal jurisdiction and venue are uncontested.

## II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id.*; Fed. R. Civ. P. 56(c)(1)(A). Or, the movant can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B). If the movant meets its burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists. *Celotex*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III. BACKGROUND

The mere filing of cross motions for summary judgment does not warrant the entry of judgment, but it is often "probative of the nonexistence of a factual dispute." *Ga. State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs*, ___

F.3d ____, ____, 2015 WL 75269, at *7 (11th Cir. 2015) (citing *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983) (internal quotation marks omitted)). Indeed, as acknowledged by the parties at the pretrial conference, there are no disputed facts that are material to the court's ultimate rulings.  Mr. Tindol's claims depend upon the interpretation and application of federal and state law.  A full account of the parties' positions on certain non-material, factual events is set out herein to provide complete context to the narrative.  Also, a summary of the statutory and regulatory background of state merit system employment is set forth to frame the discussion of the legal questions at issue.[1]

## A.    Relevant State Statutory and Administrative Law

### 1.    *State Employment in the Merit System*

In 1939, Alabama passed the Merit System Act, Ala. Code § 36-26-1 *et seq*., for the purpose of "assur[ing] to all citizens of demonstrated capacity, ability[,] and training an equal opportunity to compete for service with the State of Alabama."  *Id.* at § 36-26-3.  The Act created the SPD, run by a Director, *id.* at § 36-26-4, and the State Personnel Board ("SPB") consisting of five members, *id.* at § 36-26-5.  The Act empowers the Director to recommend the promulgation of rules to carry out the Act.  *Id.* at § 36-26-9.  Many such rules, discussed *infra*, have been

---

[1] All citations to document numbers assigned by CM/ECF are to the page numbers created by CM/ECF.  Where record citations lack a reference to CM/ECF document numbers, the citations are to the page numbers provided on the documents as they were prepared originally.

promulgated, and they "apply to all positions in the classified service."  Ala. Admin. Code r. 670-X-2-.01.

The Act categorizes State employees into exempt, unclassified, and classified service positions.  Classified service includes most state employees.  *See id.* at § 36-26-10(d).  The Act requires the Director to "conduct tests to establish employment registers for the various classes of positions in the classified service." *Id.* at § 36-26-15(a).  Thus, the SPD receives applications from interested candidates and subjects the candidates to examinations, if the candidates meet minimum qualifications for the jobs they seek.  *See* Ala. Admin. Code r. 670-X-9-.01(1)–(3).  Candidates are rated by the SPD "based upon a weighted average of the various parts of the total examination."  Ala. Admin. Code r. 670-X-9-.01(6). Applicants with passing grades are placed on a register for the position sought; a register is simply a list of all minimally qualified applicants for a position.  Ala. Admin. Code r. 670-X-9-.02(1); Ala. Code § 36-26-2(5).

The Director maintains promotional registers, *see* Ala. Admin. Code r. 670-X-9-.02(2), which comprise existing merit system employees seeking promotion, Ala. Admin. Code r. 670-X-3-.01(c)(2), as well as open registers, which include the names of candidates outside the merit system who are competing with merit system employees for positions, *see* Ala. Admin. Code r. 670-X-3-.01(c)(1).

The SPD ranks candidates on registers by either identifying the candidates in order of their scores, from highest to lowest or by "banding" candidates, a process that involves the use of statistics to place candidates into a common group or band where there are statistically insignificant differences in their scores. (Graham Aff. at ¶ 16.)

When a vacancy within a state agency opens, and the agency's appointing authority seeks to fill the vacancy through the "regular appointment" process, Ala. Admin. Code. r. 670-X-3.01(b)(1),[2] the agency's appointing authority[3] asks the SPD Director for a "certification of eligibles." Ala. Admin. Code r. 670-X-9-.03(1)–(2). An SPD-issued certification of eligibles is the top ten names on the register plus any ties; hence, a certification of eligibles may contain far more than ten persons' names. (Graham Aff. at ¶ 18.)

The SPB Rules provide that

Within the discretion of the Director, vacancies in classified positions shall be filled, insofar as practicable, by promotion from among regular employees holding positions in the classified service. Promotion shall be based upon merit and competition and shall be made in accordance with the procedures established by those sections of these rules dealing with promotional appointments.

---

[2] All of the relevant vacancy appointments at issue in this case were for regular appointments.

[3] Ms. Magee is the appointing authority for ADOR.

Ala. Admin. Code r. 670-X-9-.04(1).[4]   Rule 670-X-9-.04(1) states clearly that vacancies are ideally filled by promotion from within the classified service, but the Director has discretion to use open registers when furnishing registers to agencies for the filling of vacancies.

Once a person is selected and hired into the classified service or promoted into a new position within the classified service, he or she must complete a probationary "working test" period before attaining merit system status.   Ala. Admin. Code r. 670-X-10-.01.   After satisfactorily completing the probationary period, he or she attains a property interest in his or her state employment.[5]

Pursuant to the Merit System Act, there are also job classification titles and assigned pay grades for every position within the classified service.  Eligibility for "steps" through the pay grade is based on annual employee performance appraisal ratings.  An employee progresses through his pay grade until he reaches the top of the pay grade or is promoted into a position with a higher pay grade.  (Graham Aff. at ¶¶ 7–8.)

---

[4] Ms. Graham says that the requirement that promotions be based on merit and competition applies only to vacancies filled using a promotional register – not an open register. (Graham Aff. at ¶ 26.)  Mr. Tindol claims that the requirement applies regardless of the type of register used to fill a vacancy.

[5] An agency may terminate the employment of a classified employee, but the employee is entitled to appeal his or her termination to the SPB.

## 2.   *Entitlement to a Hearing Before the SPB*

The SPB is tasked with numerous duties that assist the Director in the administration of the Merit System, including conducting public appellate hearings for state employees who are dismissed from their employment by a state agency or whose discipline or removal is requested by any Alabama officer, citizen, or taxpayer.  *Id.* at § 36-26-27(a)–(b); *see also* Ala. Admin. Code r. 670-X-18-.02. Critical to the dispute here, neither the Merit System Act nor the SPB Rules grant state employees the right to a hearing before the SPB or the Director when they are denied a promotion by a state agency.

The only exception to that rule is that a person may obtain a special hearing before the SPB if there is reason to believe that he or she has been discriminated against on the basis of certain protected characteristics or activities in violation of federal law.  *See* Ala. Admin. Code r. 670-X-4-.01; Ala. Admin. Code r. 670-X-4-.03.[6]  The SPB adopted its ruling prohibiting discrimination several decades ago in response to a discrimination lawsuit, and the SPB "has reaffirmed [its] narrow

---

[6] Rule 670-X-4-.03 provides:

Any applicant or employee who has reason to believe that he has been discriminated against because of religious or political opinions or affiliations or race, sex, national origin, age, or handicap in any personnel action may appeal to the State Personnel Board.  The appellant and the person responsible for the alleged discriminatory action shall have the right to be heard by the Board or a special hearing agent and to present evidence.  If the Board finds after hearing that there was discrimination on any of the above nonmerit factors, it shall order appropriate corrective action and its decision shall be final.

interpretation of the scope" of Rule 670-X-4-.03 "numerous times." (Graham Aff. at ¶ 36.)

For example, in one instance a state employee sought a hearing before the SPB based upon her allegation that she was denied a promotion because of nepotism within her agency. *See* SPB Recommendation and Order in *Richbourg v. Kennedy* (Doc. # 38-3). The SPB ruled that "nepotism is not considered a 'non-merit factor' for purposes of SPD Rules 670-X-4-.01–03" and that it therefore lacked jurisdiction to hear an appeal based on a non-promotion motivated by nepotism. (Doc. # 38-3, at 18–20; 22–23.) The Circuit Court of Montgomery County, Alabama, dismissed a petition for review of that interpretation of the SPB Rules. (Doc. # 38-4.)

## B.   Facts

### 1.   *Mr. Tindol's Application and Hire as Programmer*

Since October 16, 2010, Mr. Tindol has been employed by the Alabama Department of Revenue in the IT Division. Before and during some of Mr. Tindol's tenure, his mother, Holley Tindol, also worked for the Department of Revenue as the Assistant Director of the IT Division. Kenneth Ball is the former Director of the IT Division. Mr. Ball chose Holley Tindol for the assistant director position in 2008 and intended to train her to take over his job upon his retirement. (Ball Dep. at 289–90.)

Mr. Tindol was interested in state employment and first applied to work for the State of Alabama as a programmer in 2009, but was not hired.  A programmer is an entry-level IT position.  Mr. Tindol applied again for programmer analyst associate, a higher-level position, in 2010 and was placed on the open register for the position.  About the same time, he completed his college degree at Faulkner University.

In late 2010, Mr. Ball learned that he could hire four programmers to work in ADOR's Revenue Integrated Tax System ("RITS").  He intended to place two hires in RITS production and two in RITS discovery.  Holley Tindol informed Mr. Ball that her son would be on the open register of candidates for programmer.  Mr. Ball discussed Mr. Tindol's situation and potential hire with the acting Commissioner at the time, Cynthia Underwood, and ADOR Secretary, Lewis Easterly.  Neither Ms. Underwood nor Mr. Easterly objected to Mr. Tindol working at ADOR so long as Holley Tindol did not supervise him.  (Ball Aff. at ¶ 15.)  Mr. Easterly determined that Holley Tindol should not participate in the interview of her son.  (Ball Dec. at ¶ 15.)  Hence, she participated in most of the interviews of fifty-five to sixty other candidates, but not in Mr. Tindol's interview. (H. Tindol Dep. at 117.)  Mr. Ball participated in Mr. Tindol's interview only, in Holley Tindol's stead.

Mr. Ball and Holley Tindol chose two IT team leads, Angela Free and Matt Dyer, to assist in the candidate interview process with them and to recommend their ranked preference of candidates. Holley Tindol acknowledges that, before Mr. Tindol was interviewed, Ms. Free and Mr. Dyer questioned her about the propriety of Mr. Tindol being interviewed and hired to work in the IT Division under his mother. According to Defendants, there was disagreement among the four about Mr. Tindol's merits vis-à-vis the other candidates, but Mr. Ball recalls that Mr. Tindol was actually sixth on Ms. Free and Mr. Dyer's list (Ball Dep. at 110). Mr. Ball says that one of the two candidates ahead of Mr. Tindol declined a job offer and another was rendered ineligible by Mr. Ball because the candidate had not passed a programming test administered as part of the interview. Ultimately, Mr. Ball chose Mr. Tindol along with three other hires – JoLynn DeMorrow, G. Wade Lewis, and Joshua Stacey. Mr. Tindol was assigned to the RITS Discovery Unit.

Before accepting the position and reporting to work in October 2010, Mr. Tindol consulted with Mr. Ball about his ability to advance within ADOR. Mr. Tindol had a similar offer to work as a programmer with the Department of Youth Services. Mr. Tindol says that he chose to work at ADOR as opposed to the Department of Youth Services because Mr. Ball represented to him that ADOR has a much larger IT Division than most agencies and there are more opportunities for

promotion there.[7]   When Mr. Tindol was hired, Mr. Ball restructured the IT Division so as to remove the possibility that Holley Tindol would oversee her son. Under the adjusted arrangement, Mr. Tindol reported to Thomas Farris, Jr., who reported to Mr. Ball.   The parties strenuously dispute whether Holley Tindol remained in a position of authority over Mr. Farris and Mr. Tindol.   (*Compare* Ball Dec. at ¶ 25 ("At no time during my tenure did Ms. Tindol supervise Mr. Tindol . . . . Mr. Farris was Mr. Tindol's direct report.   Mr Farris, in turn, reported to me."), *with* Linda Ellis Aff.[8] at ¶¶ 8, 10 ("Essentially, [Holley Tindol] was second in command of the IT Division" when Mr. Tindol was hired, and "because she served as Assistant Director of the entire division, Kyle Tindol was in his mother's chain of command.").)   Defendants' position is that, even if Holley Tindol was removed from the direct supervision of Mr. Farris or her son, she was nonetheless a superior of both by virtue of her position as second-in-command beneath Mr. Ball.

When hired, Mr. Tindol received ADOR's Employee Handbook and agreed to read and follow it.   (Doc. # 30-8.)   The Employee Handbook contains the following language in its introduction:

---

[7] Of approximately 1,200 ADOR employees, approximately ninety of them work in the IT Division.

[8] Linda Ellis has been the HR Director of ADOR since January 2012.   Prior to January 2012, she was the Assistant HR Director for ten years.   (Ellis Aff. at ¶ 3.)

DISCLAIMER:  NOTHING IN THIS HANDBOOK SHOULD BE CONSTRUED TO PROMISE FUTURE EMPLOYMENT. FURTHER, NO MANAGEMENT MEMBER HAS THE RIGHT TO MAKE COMMITMENTS THAT NEGATE THE HANDBOOK. EMPLOYEES ARE RETAINED BASED ON THE MISSION NEEDS OF [ADOR] AND THE INDIVIDUAL'S ABILITY TO PERFORM HIS/HER JOB IN A COMPETENT AND ETHICAL MANNER.

(Doc. # 30-9, at 8.)  Mr. Tindol testifies that he "didn't really think" that the Employee Handbook constituted any kind of contract.  (Pl's Dep. at 107.)  Mr. Tindol does not dispute that Mr. Ball never promised him a promotion at any certain time in the future.  (Pl.'s Dep. at 92.)

## 2.   *Promulgation of ADOR Anti-Nepotism Policy*

In January 2011, Governor Robert Bentley appointed Julie Magee as ADOR Commissioner.  When Ms. Magee assumed her position, Ms. Free complained to her that Mr. Tindol had been hired on the basis of nepotism.[9]  Ms. Magee responded by creating a working group comprising ADOR employees to investigate other state agencies' nepotism policies and to draft a formal anti-

---

[9] Ms. Free also complained that Holley Tindol had created "unbearable working conditions" for her and violated ethics laws.  (Magee Dep. at 14.)  Ms. Magee hired independent investigators to handle the claim.  The investigators concluded that Holley Tindol had a conflict of interest and used her position inappropriately to influence her son's hire, but the investigators did not find that Holley Tindol retaliated against Ms. Free or created a hostile work environment for her.  (*See* Doc. # 48-8.)  Holley Tindol was eventually given a written warning from Ms. Magee for using "poor judgment" in her "aggressive advocation" on behalf of Mr. Tindol during the programmer selection process.  (Holley Tindol Dep. at 198.)

Ms. Free's complaint about Holley Tindol also reached Ms. Graham, who referred it to the State Ethics Commission.  The parties dispute whether Holley Tindol was cleared of any ethics violation.

nepotism policy for ADOR.  (Magee Aff. at ¶ 6.)  The group determined that an anti-nepotism policy should be implemented in order to avoid the potential for or the appearance of favoritism, conflicts of interest, or workplace disruptions. (Magee Aff. at ¶ 6.)

On June 24, 2011, Ms. Magee sent an interoffice memorandum to her employees informing them of a departmental anti-nepotism policy ("the Policy") effective July 1, 2011.  The Policy provides that "applicants will not be hired, nor will employees be promoted or transferred into the same division where a relative is already employed."  (Doc. # 30-1, at 4.)  It also prohibits an employee from participating in the hiring or reassignment of a relative or in the supervision of any relative.  (Doc. # 30-1, at 4.)  The Policy contains the following "grandfather" proviso:

> Existing relationships as of July 1, 2011, . . . will be grandfathered for current work assignments and promotions that do not result in one relative supervising the other.  However, the new policy will still be enforced regarding relatives not participating in the hiring, evaluation, reassignment, promotion, supervision, or discipline of a relative or member of a household.

(Doc. # 30-1, at 4.)  The Policy defines "Chain of Command" as "[a] system whereby authority passes down from the top through a series of supervisory positions in which each is accountable to the one directly superior."  (Doc. # 30-1, at 3.)

As required by the Policy, Mr. Tindol completed a form disclosing his relationship to his mother. (Doc. # 30-2.) He met with Mr. Farris and Mr. Ball to discuss the Policy's impact upon his situation. Mr. Tindol was assured by Mr. Ball that "[the Policy] would have no impact on [him] at all" because his mother was not in his supervisory chain of command, nor would she be if Mr. Tindol was promoted. (Ball Dep. at 236.) Mr. Tindol believed that the Policy grandfathered his existing situation, so long as any work assignments and promotions did not result in his being supervised by his mother. Mr. Tindol never received similar assurances from Ms. Magee.

### 3.   *Denial of Promotions in 2012 and 2013*

During his tenure as a programmer, Mr. Tindol provided a quality of work two skill levels above the level required of a programmer. (Ball Dec. at ¶ 27.) Mr. Farris gave Mr. Tindol "glowing reports" and "excellent performance appraisals," and depended upon Mr. Tindol's knowledge about RITS discovery. (Ball Dec. at ¶ 27.) Mr. Tindol says that he assisted Mr. Farris by reviewing other people's work and acted as second-in-command in Mr. Farris's absence. (Pl.'s Dep. at 121, 128.)[10]

---

[10] There is discussion in the briefing about Ms. Magee's subsequent requirement that supervisors desist in giving perfect scores to ADOR employees on evaluations. Mr. Tindol complains that Ms. Magee later allowed some female employees to receive perfect scores on their evaluations, but not him. Whether or not this is true, it is beyond the scope of Mr. Tindol's pleaded claim for equal protection, and further, there appears to be no evidence that a less than perfect evaluation score was ever a factor in Mr. Tindol's non-promotion.

In May 2012, Mr. Ball recommended to Ms. Magee that Mr. Tindol be promoted to programmer analyst associate.   (Doc. # 37-9, at 2.)   Instead, Ms. Magee appointed two other persons to the vacancies.   Again in April 2013 and May 2013, Ms. Magee appointed someone other than Mr. Tindol to a programmer analyst associate vacancy.   In each instance, SPD furnished ADOR with a Certification of Eligibles from an open register, per ADOR's request.   (Graham Aff. at ¶¶ 20, 23, 24.)   In each instance, Mr. Tindol was in Band 1 along with several other eligible candidates.   Ms. Magee says that she denied Mr. Ball's recommendation to promote Mr. Tindol because she believed that a promotion would violate ADOR's nepotism policy insofar as Holley Tindol would be in Mr. Tindol's chain of command because she was the Assistant Director of the IT Division.   (Magee Aff. at ¶ 8 ("In my view, [Holley Tindol was] in the chain of command for every employee of the IT Division except its Director.").)

Other persons who disclosed familial relationships have been promoted within ADOR since the promulgation of the nepotism policy, but only where their promotions did not result in their being in the chain of command of a family member.   (Ellis Aff. at ¶ 15 (citing Aff. Ex. C).)   Ms. Magee maintains that Mr. Tindol's potential promotion to programmer analyst associate was not "grandfathered by" the Policy because any promotion, after the promulgation of the Policy, would result in a new Policy violation.   (Magee Dep. at 52.)   Mr. Tindol

16

holds fast, however, arguing that his promotion would not have violated the Policy because he would have remained in the same IT division with the same reporting structure, outside of Holley Tindol's chain of command.[11][12]

Furthermore, Mr. Tindol cites the absence of any nepotism conflict during the period that he was denied a promotion by Ms. Magee. Effective March 5, 2012, Ms. Magee assigned Holley Tindol indefinitely to the ISD Division of the Alabama Department of Finance because ISD needed her assistance and because ADOR "had a very volatile situation in the IT Department" between Holley Tindol and Ms. Free. (Magee Dep. at 23.) Mr. Tindol maintains that his mother had no management responsibilities with ADOR at any time after March 2, 2012. Ms. Magee explains Mr. Tindol's nepotism conflict still existed notwithstanding Holley Tindol's temporary assignment outside of ADOR because Holley Tindol retained her title and position in ADOR's IT Division.

---

[11] As discussed *infra*, Mr. Tindol further asserts that Alabama's statute concerning nepotism in state service excepts from its restrictions "normal promotional advancements under the state Merit System." Ala. Code § 41-1-5(b). Before the statute was updated in 2013, it similarly provided that the law "shall not apply . . . in the case of an appointment of a person to a position in the classified service of the state made from the register of persons eligible as certified by the [SPD Director]." (Doc. # 37-4, at 13 (copy of Ala. Code § 41-1-5 (1963)).) Mr. Tindol's position on the nepotism statute is set out in his briefs. (Doc. # 36, at 3; Doc. # 47, at 14–15.) Defendants contend that the statute is completely irrelevant to the case. (Doc. # 50, at 19–21.)

[12] In the Complaint, Mr. Tindol also claims that all of the other programmers who were hired at the same time that he was hired in 2010 were recommended for promotion and actually promoted by Ms. Magee before him. JoLynn DeMorrow and G. Wade Lewis were the ones promoted in 2012. But it appears that Joshua Stacey left employment with ADOR for another opportunity; it does not appear that he was promoted before he left ADOR.

17

In his summary judgment responsive brief, Mr. Tindol claims that

On October 1, 2011, James Lucy was promoted from the position of Revenue Division Director in Individual and Corporate Division from the Revenue Manager II position in that division. His daughter, Brittni Lucy Potter, who was working in the REII position in the same division was promoted to the REIII position and transferred to a newly created position in the Discovery unit in the Commissioner's office. That transfer was effectuated to allow for the promotion of Mr. Lucy so that the nepotism policy would not have been violated. Brittni Lucy was not required to interview or compete for that promotion.

(Doc. # 47 at 15 (internal citations to record omitted).) Mr. Tindol asserts that ADOR's accommodation of the Lucy family members is evidence that others have been treated more favorably and that the Policy has been applied "solely" against him. (Doc. # 47, at 16.) He also attempts to alter his equal protection claim, through briefing, to assert sex discrimination.[13]

### 4.   *Request for SPB Hearing in 2012*

In August 2012 after Mr. Tindol was first informed that Ms. Magee had denied Mr. Ball's first recommended promotion, he submitted a memorandum complaining to Ms. Magee about the decision not to promote him and requesting that she reconsider. (Doc. # 33-13.) He also sent the memorandum to Ms. Graham and requested that she and the SPD review Ms. Magee's decision. Ms. Magee says she did not respond to Mr. Tindol's memorandum because ADOR has 1,200

---

[13] Defendants stress that Brittni Lucy was not promoted until after she transferred divisions and that the transfer alleviated a nepotism conflict for her father, not her. As discussed *infra*, the comparison between the Tindol and Lucy families is outside of the scope of this suit.

18

employees and Mr. Tindol did not follow the procedure for filing a complaint through the proper chain of command.  (Magee Dep. at 54–55.)[14]  Mr. Tindol alleges that Ms. Graham "refused to provide [him] with access to the appellate process" and "ratified" Ms. Magee's decision not to promote Mr. Tindol.  (Compl. at ¶ 36.)

Ms. Graham conveyed Mr. Tindol's request to an SPD administrative law judge, Randy C. Salle, who responded to Mr. Tindol's counsel in writing in December 2012, explaining that no SPB rule entitled a state employee to a hearing before the SPB to decide a dispute between the employee and his supervisor.  (Doc. # 33-16.)  The only exception identified in the ALJ's letter was for situations in which an employee had reason to believe he had been "discriminated against because of religious or political opinions or affiliations or race, sex, national origin, age, or handicap."  (Doc. # 33-16 (citing Ala. Admin. Code r. 670-X-4-.01 and r. 670-X-4-.03).)  Mr. Tindol has denied in his deposition that Ms. Magee discriminated against him on any of those bases.

### 5.   *Promotion in 2014*

On November 1, 2013, Ms. Magee permanently transferred Holley Tindol to the Alabama Department of Finance.  (Doc. # 30-4.)  In March 2014, during the

---

[14] When asked why she previously agreed to personally hear Ms. Free's grievance, Ms. Magee responded that the grievance policies changed after Ms. Free lodged her complaint.  Mr. Tindol responds that the policy for entertaining grievances has always been the same.  (*See* Doc. # 48-9.)  At any rate, there is no assertion that Ms. Magee was obligated to meet with Mr. Tindol.

pendency of this litigation, Ms. Magee promoted Mr. Tindol to programmer analyst associate effective May 1, 2014.  (Doc. # 30-6.)  Mr. Tindol was appointed to the position along with two other candidates from the open register after interviewing with Ms. Free and Mr. Dyar.  Mr. Tindol maintains Ms. Magee was obligated by law to promote him sooner (as early as 2012) on the basis of merit – *i.e.*, without having to compete and interview with persons from the open register. (Doc. # 47, at 22.)  Mr. Tindol also complains that Ms. Magee unnecessarily and maliciously delayed his promotion between Holley Tindol's November 2013 transfer and his March 2014 appointment.  (Doc. # 47, at 20, 45–46.)

## C.  <u>Procedural History</u>

On February 13, 2013, Mr. Tindol filed this suit against ADOR, the SPD, Ms. Magee, and Ms. Graham.  Ms. Magee and Ms. Graham are sued in both their official and individual capacities.  Mr. Tindol raises federal-law constitutional claims under § 1983 for violation of his rights to equal protection and procedural due process under the Fifth and Fourteenth Amendments (Counts I–II),[15] and state-law claims for negligence and breach of employment contract (Counts VII–VIII).[16] He seeks both compensatory and punitive damages on all claims.  (Compl. at 13.)

---

[15] Mr. Tindol voluntarily dismissed his substantive due process claim (Count III).  (Doc. # 27.)

[16] There are no Counts IV, V, or VI.

He further requests non-specific declaratory and permanent injunctive relief as well as backpay.  (Compl. at 14.)  The Complaint has not been amended.

In his brief in opposition to Defendants' motions for summary judgment, Mr. Tindol requests the following prospective injunctive relief:  (1) that his current probationary status be waived;[17] (2) that he receive a two-step salary adjustment so that his compensation will be the same as his peers who were hired at the same time but promoted sooner; (3) that ADOR conform the Policy to the State's nepotism statute; and (4) that the SPB's rules be revised to require a mandatory hearing where a state agency offers a "nonmerit" factor as a reason for the denial of a promotion to a merit system employee.  (Doc. # 47, at 22–23.)

## IV.  DISCUSSION

The discussion proceeds by addressing (A) what appears to be uncontested, including the merits of summary judgment in favor of ADOR and the SPD, (B) the official-capacity claims against Ms. Magee and Ms. Graham, and (C) the individual-capacity claims against Ms. Magee and Ms. Graham.

## A.    <u>Uncontested Defenses</u>

Defendants highlight three of their arguments that Mr. Tindol has not addressed in his responsive briefing, and they contend that Mr. Tindol has thereby abandoned or conceded certain claims.  (Doc. # 50 at 13–16.)  First, Defendants

---

[17] Presumably, this request is a moot point because Mr. Tindol has been a programmer analyst associate for more than six months.

argue that because there are no federal government actors sued, Mr. Tindol has no § 1983 claims arising under the Fifth Amendment.   Second, Defendants contend that Mr. Tindol has not disputed ADOR and the SPD's entitlement to immunity under the Eleventh Amendment, and that they are entitled to summary judgment on the basis of sovereign immunity.[18]

It is well settled that litigants bear the burden to formulate their arguments in response to a motion for summary judgment.   "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."   *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).   On the basis of Mr. Tindol's failure to respond and on the merits of Defendants' arguments, summary judgment is due to be granted (1) in favor of all Defendants on Mr. Tindol's Fifth Amendment claims, (2) in favor of ADOR and the SPD on all of Mr. Tindol's claims, on the basis of sovereign immunity, and (3) in favor of ADOR and the SPD on Mr. Tindol's federal constitutional claims because neither ADOR nor the SPD is a "person" for purposes of a § 1983 suit.[19]

---

[18] Finally, Defendants assert that Mr. Tindol "implicitly concedes" that no contract ever existed between himself and either SPD, Ms. Graham in her official or individual capacity, or Ms. Magee in her individual capacity.  (Doc. # 50, at 16.)  The court disagrees that Mr. Tindol has clearly conceded his breach of contract claim against Ms. Graham and the SPD because his briefing addresses "Defendants" in the plural.  The breach of contract claim is discussed *infra*.

[19] Additionally, the court's conclusions *infra* at Parts IV.C.2 and IV.C.4 that Mr. Tindol's claims fail on the merits apply to ADOR and the SPD, and ADOR and the SPD's motions for summary judgment are due to be granted on the merits as well.

Remaining are the claims against Ms. Magee and Ms. Graham in their official and individual capacities.

## B.   Official-Capacity Claims

In their official capacities, Ms. Magee and Ms. Graham claim immunity from Mr. Tindol's federal- and state-law claims.

### 1.   *Eleventh Amendment Immunity*

Ms. Magee and Ms. Graham argue that, in their official capacities, they are entitled to absolute immunity on all Mr. Tindol's claims pursuant to the Eleventh Amendment.  (Doc. # 31 at 7–9; Doc. # 38 at 5–8.)  They also assert that they are not proper defendants to Mr. Tindol's § 1983 claims because state officials acting in their official capacities are not "persons" under § 1983.  (Doc. # 31, at 6–7; Doc. # 45, at 13–14.)  There is no dispute that the State of Alabama has not waived its Eleventh Amendment immunity by consenting to suit, *see* Ala. Const. art. I, § 14, and Congress has not abrogated Alabama's immunity per its power to enforce Section Five of the Fourteenth Amendment, s*ee Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1524–25 (11th Cir. 1990) (identifying these exceptions to Eleventh Amendment immunity).

Further, both Ms. Magee and Ms. Graham contend that the exception to Eleventh Amendment immunity created by *Ex parte Young*, 209 U.S. 123 (1908), has no applicability in this case.  Since *Ex parte Young*, federal courts have "found

federal jurisdiction over a suit against a state official when that suit seeks only prospective injunctive relief in order to end a continuing violation of federal law." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996) (internal quotation marks omitted).  Ms. Magee argues that Mr. Tindol has not shown how she has violated any federal law.  Even assuming that she has violated federal law, Ms. Magee contends that Mr. Tindol is seeking retroactive rather than prospective relief. (Doc. # 31, at 9–11.)  Ms. Graham raises very similar arguments.  (Doc. # 38, at 6–8.)  Collectively, they argue that any request for backpay is retrospective rather than prospective.  The only prospective relief available would be an appointment to programmer analyst associate, and Mr. Tindol has already obtained that appointment during the pendency of this suit.  (Doc. # 45, at 14–16.)

Mr. Tindol responds that there are "ongoing" constitutional violations and the relief sought is prospective in nature.  (Doc. # 47, at 22.)  He represents that he is seeking the following prospective relief:  that his probationary status be waived; that he receive a two-step salary adjustment, which would put him on the same footing as comparators hired at the same time; that the Policy be revised to comport with Alabama's nepotism statute; and that the SPB's rules be revised to allow for hearings when an agency denies a promotion on the basis of any nonmerit factor.  (Doc. # 47, at 22–23.)

Defendants reply that Mr. Tindol's Complaint omits these specific requests for prospective injunctive relief and that the deadline for amending the pleadings has passed. (Doc. # 50, at 40.) Furthermore, Defendants argue that all of the alleged constitutional violations (the failure to promote him or to provide a hearing concerning the non-promotion) are completed and are not ongoing.

Upon consideration of the parties' contentions, the court concludes that the *Ex parte Young* doctrine is inapplicable and that Ms. Magee and Ms. Graham are therefore entitled to sovereign immunity on Mr. Tindol's claims against them in their official capacities. The prospective relief Mr. Tindol wishes to obtain is not attainable because it is not sought in the Complaint and the Complaint has not been amended to seek the specific injunctive relief Mr. Tindol now requests. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam) ("A plaintiff may not amend [his or her] complaint through argument in a brief opposing summary judgment."); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) ("[A]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)."); *see also* Uniform Scheduling Order setting August 5, 2013 as the deadline to amend the pleadings (Doc. # 19, at § 4).

In the absence of an *Ex parte Young* exception, Eleventh Amendment immunity applies to Mr. Tindol's federal-law claims against Ms. Magee and Ms.

Graham in their official capacities because they are arms of the State of Alabama. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) ("The Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest.") (internal quotation marks omitted).[20]   Moreover, on this record, no official-capacity suit is sustainable under § 1983.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (holding that States are not "persons" subject to suit under § 1983, and a suit under § 1983 against a state official "is no different from a suit against the State itself").

### 2. *Article I, § 14 Immunity*

Ms. Magee and Ms. Graham also assert that Mr. Tindol's state-law claims against them in their official capacities must be dismissed because each is guaranteed absolute immunity by the Alabama Constitution.  (Doc. # 31, at 15; Doc. # 38, at 8.)  Section 14 of Article I provides that "the State of Alabama shall never be made a defendant in any court of law or equity."  Ala. Const. art. I, § 14. "Section 14 prohibits actions against state officers in their official capacities when those actions are, in effect, actions against the State."  *Haley v. Barbour Cnty.*, 885 So. 2d 783, 788 (Ala. 2004).   "[A]n action is one against the State when a favorable result for the plaintiff would directly affect a contract or property right of

---

[20] Mr. Tindol also asserts that he seeks injunctive relief against Ms. Magee and Ms. Graham to compel them to follow state law (Doc. # 47, at 46), but as the court has stated, his Complaint has not been properly amended to seek that relief, and in any event, the Eleventh Amendment deprives federal courts of jurisdiction to order state court officials to comply with state law.  *See Pennhurst*, 465 U.S. at 121.

the State, or would result in the plaintiff's recovery of money from the State." *Ex parte Bessemer Bd. of Educ.*, 68 So. 3d 782, 790 (Ala. 2011) (internal quotation marks, alterations, and emphases omitted).   Mr. Tindol does not dispute Defendants' position with respect to the imposition of damages.  (Doc. # 47, at 46.) To the extent that Mr. Tindol seeks monetary damages on his claims, Ms. Magee and Ms. Graham, in their official capacities, are entitled to § 14 immunity in addition to Eleventh Amendment immunity.[21]

## C.   Individual-Capacity Claims Against Ms. Magee and Ms. Graham

In their individual capacities, Ms. Magee and Ms. Graham claim entitlement to various immunity defenses on Mr. Tindol's federal- and state-law claims.  They also expose the heart of the case and seek summary judgment on the merits of every claim.

### 1.   *Qualified Immunity on Federal-Law Claims*

Ms. Magee and Ms. Graham seek qualified immunity on Mr. Tindol's federal constitutional claims against them in their individual capacities for monetary damages.  (Doc. # 39, at 42–45.)  "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

---

[21] The court's conclusions *infra* at Parts IV.C.2 and IV.C.4 that Mr. Tindol's claims fail on the merits also apply to the claims against Ms. Magee and Ms. Graham in their official capacities, and thus, their official-capacity motions for summary judgment are due to be granted on the merits.

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Mr. Tindol objects that neither Ms. Magee nor Ms. Graham engaged in discretionary functions because state law compelled his mandatory promotion.  (Doc. # 47, at 38.)  Mr. Tindol is mistaken about state law.  No law required Ms. Magee to promote him, nor Ms. Graham to afford him appellate relief with the SPB after his non-promotions.  Ms. Magee and Ms. Graham have shown that they each acted within the scope of their discretionary authority, and that their contested actions were "carried out in the performance of [their] normal job duties" and were "within the authority" they are afforded as the ADOR Commissioner and the SPD Director, respectively.  *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988).  It is therefore Mr. Tindol's burden to show that their actions violated federal constitutional law existing at the time the challenged actions occurred.  *See id.*

Mr. Tindol cannot satisfy his constitutional burden for the reasons set out *infra*, namely that Mr. Tindol has not shown that Ms. Magee or Ms. Graham violated his rights to either equal protection or procedural due process. Additionally, Mr. Tindol offers no Supreme Court or Eleventh Circuit authority to support the proposition that he or any other Merit System employee in Alabama had a clearly established federal constitutional right to a promotion.  Accordingly,

Ms. Magee and Ms. Graham are entitled to qualified immunity on Mr. Tindol's federal-law claims.

### 2.    *Merits of Federal-Law Claims*

#### a.    Equal Protection

##### i.    Policy As-Applied to Mr. Tindol

The Equal Protection Clause prohibits the State of Alabama from depriving any person within its jurisdiction of equal protection of the laws.   U.S. Const. amend. XIV, § 1.   The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike" by state government.   *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).   Differential treatment alone is insufficient to establish an equal protection claim in the absence of evidence that the unequal treatment was based on a constitutionally protected interest.   *See Jones v. Ray*, 279 F.3d 944, 947 (11th Cir. 2001) (per curiam).

To the extent Mr. Tindol raises an as-applied challenge, Defendants argue that Mr. Tindol cannot demonstrate that he has suffered discriminatory treatment at all, let alone discrimination on the basis of a constitutionally protected interest. (Doc. # 39, at 31–35.)   Defendants represent that no one promoted from programmer to programmer analyst associate in 2012 or 2013 was similarly situated to Mr. Tindol.   That is, no comparator who was promoted had a close

relative in management within ADOR's IT Division.[22]  Further, Defendants assert that there is no evidence that Ms. Magee or Ms. Graham exhibited discriminatory intent toward Mr. Tindol.  Mr. Tindol may not proceed under a "class of one" theory because such a claim for relief is unavailable to public employees.  *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 607 (2008).

In response, Mr. Tindol claims – for the first time – that certain similarly situated ADOR employees have been treated more favorably than Mr. Tindol subsequent to the Policy's promulgation.  Mr. Tindol alleges that in order to promote James Lucy, ADOR transferred Mr. Lucy's daughter, Brittni Lucy, to a new division outside of his chain of command.  As a result, Brittni Lucy received a promotion for which she was not required to compete.[23]  Mr. Tindol complains that he did not receive a similar accommodation, but he does not explain how ADOR could have similarly accommodated him when all ADOR programmers work within the IT Division.  Additionally, Mr. Tindol alleges that Ms. Magee gave Ms. Free an audience when Ms. Free complained about Holley Tindol, but that Ms. Magee refused to meet with Mr. Tindol when he raised his complaints.  Further, Mr. Tindol alleges that females in the IT Division were permitted to receive perfect scores on their evaluations while Ms. Magee required Mr. Tindol's superiors to

---

[22] Defendants address programmer comparators promoted within the IT Division, as these are the only comparators at ADOR that appear to be identified in Mr. Tindol's Complaint.

[23] Defendants clarify that Brittni Lucy was transferred in 2011, prior to her father's promotion the same year, but that she was not promoted until 2013.  (*See* Doc. # 33-12, at 21.)

provide him with less than perfect evaluation scores (*i.e.*, scores under forty points).

Hence, Mr. Tindol contends that there is evidence that similarly situated ADOR employees were treated more favorably by Ms. Magee, and that a constitutionally protected interest – gender – is implicated.  (Doc. # 47, at 28–29.) He suggests, only in briefing, that another constitutionally protected interest is infringed by the alleged disparate treatment:  his First Amendment right to intimate familial association.  (Doc. # 47, at 30.)

Defendants reply that "[t]he Complaint is utterly devoid of any factual allegations whatsoever regarding an equal protection claim on the basis of sex or any reference to any fact supporting the theories [Mr. Tindol] now espouses." (Doc. # 50, at 26.)  Defendants dispute Mr. Tindol's representations that he only recently discovered the facts concerning Brittni Lucy's transfer and promotion, but even if the facts were recently discovered, Defendants protest that Mr. Tindol nevertheless neglected to properly amend his pleading.  (Doc. # 50, at 26 n.7.)

It is well settled Mr. Tindol may not salvage the equal protection claim by amending his complaint through argument at this stage in the proceedings.  *See GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012). He is therefore bound to litigate only the claims he has pleaded properly.  The Complaint gave Defendants notice of Mr. Tindol's allegation that other similarly

situated persons were promoted to programmer analyst associate while Mr. Tindol was denied promotion.  (*See* Compl. at ¶¶ 40, 48, 52, 54.)  There is no allegation in the Complaint that the alleged discriminatory treatment was based on a constitutionally protected characteristic or interest such as gender or intimate familial association.  Further, Mr. Tindol has not shown that others who were promoted before him were similarly situated with respect to the applicability of the Policy.  It is undisputed that none who were promoted within ADOR had close family members employed in their chain of command when their promotions became effective.  Hence, the as-applied challenge to the Policy fails.

### ii.     Policy on its Face

To the extent Mr. Tindol raises a facial attack on the Policy, Defendants argue that the Policy easily passes rational basis review.  (Doc. # 39, at 36–38.)  Mr. Tindol responds that the Policy must be deemed unconstitutional because it conflicts with the Alabama statute concerning nepotism codified at Ala. Code § 41-1-5.  (Doc. # 47, at 33–34.)  According to Mr. Tindol, the Policy cannot be deemed rationally related to a legitimate governmental interest when Ms. Magee admitted that she did not consult the state statute.

At the time Ms. Magee promulgated the Policy, Section 41-1-5 provided:

No officer or employee of the state or of any state department, board, bureau, committee, commission, institution, corporation, authority or other agency of the state shall appoint any person related to him within the fourth degree of affinity or consanguinity to any job,

position or office of profit with the state or with any of its agencies. Any person related to the appointing authority within the prohibited degree shall be ineligible to serve in any capacity with the state under authority of such an appointment, and any appointment so attempted shall be void.   Whoever violates this section is guilty of a misdemeanor and shall be punished by a fine not to exceed $500.00 or by imprisonment not to exceed one year, or both.  *This section shall not apply, however, in the case of an appointment of a person to a position in the classified service of the state made from the register of persons eligible as certified by the State Director of Personnel.* Provisions of this section shall not apply to any individual or individuals employed as of September 16, 1963, in any branch, department or bureau of the state or the reappointment of any individuals employed on September 16, 1963.

Ala. Code § 41-1-5 (1975) (prior version of statute) (emphasis added).   That version of the statute remained in effect until the Legislature revised it in May 2013.  The emphasized language has been stricken, but the new statute similarly states:

The provisions of this section shall not prohibit the continued employment of any person who is employed as a public employee as of the effective date of the act adding this amendatory language, *nor shall it be construed to hinder, alter, or in any way affect normal promotional advancements under the state Merit System for the employee*.

Ala. Code § 41-1-5(b) (emphasis added).  Mr. Tindol fixates upon the emphasized language and argues that Ms. Magee could have lawfully promoted him in 2012 because he was on an SPD register and eligible for the promotion he desired. Thus, he disputes that the Policy applied to him, but more fundamentally, he says that the Policy conflicts with a legislative act.

Defendants reply that it does not matter whether Ms. Magee was aware of § 41-1-5 or consulted it prior to promulgating the Policy for ADOR because nothing precluded her from adopting a nepotism policy for her agency that was more specific or restrictive than the state statute, so long as the Policy has a rational basis. Defendants are right. The statute does not bar state agencies from passing more restrictive nepotism policies. Mr. Tindol's argument distracts from the necessary constitutional inquiry of a state regulation subject to a facial attack.[24]

"When legislation classifies persons in such a way that they receive different treatment under the law, the degree of scrutiny the court applies depends upon the basis for the classification." *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009) (citation omitted). "If a law treats individuals differently on the basis of race or another suspect classification, or if the law impinges on a fundamental right, it is subject to strict scrutiny," but [o]therwise, the law need only have a rational basis – *i.e.*, it need only be rationally related to a legitimate government purpose." *Id.* The Policy challenged by Mr. Tindol is subject to rational basis scrutiny.[25]

---

[24] Defendants also contend that the statute has no application in Mr. Tindol's situation because it only applies to appointing authorities who place their relatives in positions in state employment. (Doc. # 45, at 36; *see also* Doc. # 50, at 20–21.) Mr. Tindol has not controverted Defendants' interpretation of the statute. (*See* Doc. # 49.) Defendants' position is addressed more fully *infra* with respect to the procedural due process claim.

[25] Mr. Tindol has only lately raised the issue that the Policy may infringe upon his First Amendment right to intimate familial association with Holley Tindol. Even if the familial

The Policy is therefore not in violation of the Equal Protection Clause so long as it is "rationally related to a legitimate government interest." *Parks v. City of Warner Robins, Ga.*, 43 F.3d 609, 615 (11th Cir. 1995).  The Policy should be upheld so long as "there is any reasonably conceivable state of facts that could provide a rational basis for" its implementation.  *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 945 (11th Cir. 2013) (citation omitted).  Ms. Magee testifies that the purposes for implementing the Policy were to prevent conflicts of interest within ADOR, to avoid perceived or actual favoritism within the agency, and to avoid family conflict in the workplace.[26]

The Eleventh Circuit has affirmed a similar nepotism policy adopted as a city ordinance banning relatives of city employees in supervisory positions from working in the same city department.  *See Parks*, 43 F.3d at 611–12.  The City of Warner Robins advanced several legitimate government interests for its rule including "avoiding conflicts of interest between work-related and family-related obligations; reducing favoritism or even the appearance of favoritism; [and] preventing family conflicts from affecting the workplace." *Id.* at 615.  The court

---

association issue were properly before the court, Defendants cite several authorities holding that the reasons for having anti-nepotism policies outweigh any burden on the rights of persons to associate with family members.  (Doc. # 50, at 36–37.)

[26] Mr. Tindol believes that the Policy was enacted because of the complaints against his mother and applied against him as punishment.  (Doc. # 47, at 29.)  But those allegations are irrelevant where the reasons offered for the law are in fact rationally related to a legitimate purpose of the ADOR.

reasoned that "[a] rule that would prevent supervisory employees from having to exercise their discretionary power to hire, assign, promote, discipline[,] or fire their relatives is rationally related to each of these practical, utilitarian goals." *Id.*

On the basis of established federal law, the ADOR Policy survives rational basis scrutiny and is not facially unconstitutional.

### iii.    Summary of Equal Protection Claim

For the foregoing reasons, Mr. Tindol fails to show an as-applied or facial violation of the Equal Protection Clause, and consequently, Ms. Magee and Ms. Graham are entitled to summary judgment on the merits of the equal protection claim.

### b.    Procedural Due Process

The Fourteenth Amendment prohibits the States from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.   A claim for deprivation of procedural due process has three elements:   "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).   Defendants contend that Mr. Tindol cannot establish a due process violation because he has no legitimate property interest in his promotion.  (Doc. # 39, at 38–41.)

In *Grant v. Bullock County Board of Education*, 895 F. Supp. 1494 (M.D. Ala. 1995), a public school counselor contested his non-promotion and alleged, among other things, a deprivation of procedural due process. The court "stresse[d] that a public employee does not possess a property right to a promotion and, thus, is foreclosed from claiming a constitutional right to any type of hearing upon a non-promotion decision." *Id.* at 1505 (citing *Schwartz v. Thompson*, 497 F.2d 430, 432 (2d Cir. 1974)). Citing the Supreme Court's opinion in *Board of Regents v. Roth*, 408 U.S. 564, 578 n.16 (1972), the court dismissed the procedural due process claim because the plaintiff failed to furnish the court with "a statute, regulation, internal policy or rule, or a historical promotion pattern sufficient to support a claim of entitlement" to his promotion. *Grant*, 895 F. Supp. at 1505.

In *Roth*, the Supreme Court explained that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." 408 U.S. at 577. The Supreme Court has explained often that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005). Hence, "[t]he hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except for cause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) (internal quotation

marks omitted).  Such property interests arise from and are defined by "existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Roth*, 408 U.S. at 577.  And "[a]lthough the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause."  *Town of Castle Rock*, 545 U.S. at 757 (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978)) (emphasis omitted).

In accord with these principles, the Eleventh Circuit has recognized that a state employee may have a state-created property interest in his continued employment, *see, e.g.*, *Brown v. Ga. Dep't of Rev.*, 881 F.2d 1018, 1024 (11th Cir. 1989), but a state employee lacks a cognizable property interest in a prospective promotion, *Wu v. Thomas*, 847 F.2d 1480, 1485 (11th Cir. 1988); *see also Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1486 (11th Cir. 1992), (summarily citing *Wu*).[27]  Defendants thus argue that Mr. Tindol had no entitlement to the programmer analyst associate position until he was promoted into that position and completed the six-month probationary period.  Defendants insist pursuant to *Grant* and *Wu* that Mr. Tindol can point to no statute, regulation,

---

[27] *Oladeinde* was overruled on other grounds in *Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010), but its holding with respect to prospective promotions remains binding precedent.

internal policy or rule, or historical promotion pattern that is adequate to support a state-created right to promotion within the State Merit System.  (Doc. # 39, at 41.)

Mr. Tindol disagrees, citing several provisions of state law that he says entitle him to a promotion.  (Doc. # 36, at 12–15; Doc. # 47, at 34–37.)  As a permanent employee in the classified service, Mr. Tindol contends that his employment and promotion rights are governed by "the Merit Systems [sic] Act and its progeny and the Alabama State Personnel Department Administrative Code."  (Doc. # 36, at 12.)  Mr. Tindol thus leans on two statutes and one SPB Rule:  Ala. Code § 36-26-23; Ala. Code § 41-1-5; Ala. Admin. Code r. 670-X-9-.04.[28]

This court is tasked with interpreting these provisions of state law.  *Town of Castle Rock*, 545 U.S. at 757.  "[W]hether state law has created a property interest is a legal question for the court to decide."  *Morley's Auto Body, Inc. v. Hunter*, 70 F.3d 1209, 1212 (11th Cir. 1995).  If state law in fact affords a substantive property right to Mr. Tindol, the court must then determine whether that interest is federally protected by the Due Process Clause.  *Town of Castle Rock*, 545 U.S. at 757.

---

[28] Interestingly, Mr. Tindol states in the heading of his argument that he "enjoys a constitutionally protected property interest *in* the rules and understandings" found in the Merit System Act and the Administrative Code concerning his promotion.    (Doc. # 36, at 12.) Property rights may arise *from* state laws, but there is no authority to support the proposition that a person maintains a property interest *in* state laws.

### i.      The Parties' Interpretations of State Law

Section 36-26-23 provides that "within the discretion of the [SPD] [D]irector, vacancies in positions shall be filled, insofar as practicable, by promotion from among regular employees holding positions in the classified service.  Promotion shall be based upon merit and competition."

Rule 670-X-9-.04 parrots § 36-26-23, but includes some additional language.

> Within the discretion of the Director, vacancies in classified positions shall be filled, insofar as practicable, by promotion from among regular employees holding positions in the classified service. Promotion shall be based upon merit and competition *and shall be made in accordance with the procedures established by those sections of these rules dealing with promotional appointments.*

Ala. Admin. Code r. 670-X-9-.04(1) (emphasis added to show additional language).  Mr. Tindol stresses that merit-based promotions are mandatory, not discretionary.

As cited *supra* at Part IV.C.2.a.ii., the earlier version of § 41-1-5 exempts from the statutory prohibition against nepotism the appointment of "a person to a position in the classified service . . . made from the register of persons eligible as certified by the State Director of Personnel."  Ala. Code § 41-1-5 (prior version). Mr. Tindol believes that this statute confirms that his relation to his mother was not an obstacle to his merit-based promotion within ADOR's IT Division.

On the basis of this patchwork of authorities, Mr. Tindol arrives at the conclusion that Alabama law guarantees his right to a promotion in the merit system.

Defendants assert that each of these citations "plucks language, and indeed the provisions themselves, out of the greater context of the applicable statutory and regulatory scheme of the Merit System in place in Alabama." (Doc. # 45, at 24.) Defendants contend that the broader context of the Merit System Act demonstrates that appointments to vacancies in the classified service may, but do not have to be, filled by promotion. *See* Ala. Code § 36-26-17 ("Vacancies in the classified service shall be filled either by transfer, promotion, appointment, reappointment *or* demotion."). The Merit System Act entrusts the SPD Director with the discretion to use the most appropriate type of register to generate a certificate of eligibles. *Id.* ("Whenever a vacancy is to be filled by appointment, the appointing authority shall submit to the director a statement of the title of the position . . . and a request that the director certify to him the names of persons eligible for appointment to the position. The director shall thereupon certify to the appointing authority the name of the 10 ranking eligibles *from the most appropriate register*.") (emphasis added); *see also* Ala. Code § 36-26-23 ("*Within the discretion of the director*, vacancies in positions shall be filled, *insofar as practicable*, by promotion . . . .") (emphases added). Similar language is used in the Administrative Code implementing the

Merit System Act.  *See* Ala. Admin. Code r. 670-X-9.03(2)(b), Ala. Admin. Code r. 670-X-9.04(1).

Defendants explain that while an appointing authority may indicate her preference for a certain type of register, it is the Director's prerogative to choose the type of register she provides to the appointing authority.  (Graham Supp. Aff. at ¶ 4.)  Once the certificate of eligibles is furnished to the appointing authority, the appointing authority makes her selection of candidates, and when she uses a promotional register to select a candidate, her decision must be "based upon merit and competition."  Ala. Code § 36-26-23; Ala. Admin. Code r. 670-X-9-.04(1). Hence, Defendants argue, the broader statutory and regulatory scheme places the cited provisions of state law in context, and the context does not support Mr. Tindol's assertion that state law entitled him to a promotion.

With respect to Mr. Tindol's reliance upon the SPB's Rules, Defendants argue that procedural rules do not create substantive property rights.  (Doc. # 45, at 38 n.6 (citing, *inter alia*, *Olim v. Wakinekona*, 461 U.S. 238, 249–51, (1983)).) In *Olim*, the Court held that the regulations relied upon by a complaining party "place[d] no substantive limitations on official discretion and thus create[d] no liberty interest entitled to protection under the Due Process Clause."  461 U.S. at 249.  The Court explained that "[t]he State may choose to require procedures for reasons other than protection against deprivation of substantive rights, . . . but in

making that choice the State does not create an independent substantive right." *Id.* at 250–51.

With respect to the nepotism statute, Defendants contend that "[b]y its terms, [it] restrains . . . appointing authorities from making certain appointments by criminalizing such appointments" and "provides an exception to its own application for appointments made using registers." (Doc. # 45, at 32.) The law says nothing about the ability of state agencies to adopt more restrictive policies disfavoring nepotism within their ranks, like the Policy promulgated for ADOR. Ergo, Defendants argue, § 41-1-5 is irrelevant to Mr. Tindol's situation and does not support his claim of entitlement to a promotion.

In reply, Mr. Tindol claims that SPB's Rules are not procedural and says that they contain mandatory directives for state officials. (Doc. # 49 at 9–10.) Thus, according to Mr. Tindol, Rule 670-X-9-.04 "plac[es] substantive limitations on [Ms. Magee's] official discretion." *Olim*, 461 U.S. at 249.

Mr. Tindol further disputes Defendants' position by arguing that Rule 670-X-9-.04(1) itself does not make any distinction between the types of registers used to select a person for promotion. Alternatively, he contends that the open competitive register used to promote the two programmers in May 2012 was a *de facto* promotional register because Mr. Ball intended to consider only existing employees for the vacant positions. (Doc. # 47, at 36–37.) Defendants retort that

even if Rule 670-X-9-.04(1) applies to an appointment from a competitive register, Mr. Tindol "makes no attempt to explain how the rule's mandate that promotions be based on 'merit and competition' compels the conclusion that he has a recognized entitlement to a promotion." (Doc. # 50, at 23–24.)

### ii.   Judicial Conclusions on State Law

Upon careful consideration of the provisions of law upon which Mr. Tindol relies and on the parties' arguments, the court agrees with Defendants that no provision of state law in either the Alabama Code or the SPB's Rules creates a substantive property interest in promotion. As Defendants aptly acknowledge, there was a reasonable basis for Mr. Tindol's unilateral expectation that he would be promoted sooner than he was (Doc. # 45, at 33), but that basis was not in Alabama law.

The statutory and regulatory provisions upon which Mr. Tindol relies simply do not create a substantive property interest for merit system employees in their prospective promotions. The Merit System Act's requirement that promotions be based on "merit and competition" cannot be interpreted to create a right to promotion because of the discretionary nature of promotion within the State Merit System. *See* Ala. Code § 36-26-23; Ala. Admin. Code r. 670-X-9-.04(1). "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock*, 545 U.S. at 756. Ms. Graham had the

discretion, explicitly granted by the Merit System Act, to furnish Ms. Magee with a competitive register for filling any programmer analyst associate vacancies. Ms. Magee likewise had the discretion to appoint anyone on those open registers to fill the programmer analyst associate vacancies in her agency. Ms. Magee is *the* appointing authority at ADOR, and regardless of any nepotism conflicts concerning Mr. Tindol and Holley Tindol, whether those conflicts were contrived as pretext or bona fide concerns, she had no obligation to accept Mr. Ball's or anyone else's recommendations that Mr. Tindol be promoted at any time either before or after Holley Tindol's transfer.

Defendants are correct that § 41-1-5 is inapposite. The statute plainly applies to situations in which the appointing authority puts his or her relative in a job vacancy. Further, its terms indicate no prohibition on state agencies enacting their own more restrictive anti-nepotism policies. As articulated *supra* in the discussion of equal protection, Ms. Magee had the authority to promulgate the Policy. To resolve the procedural due process claim, it matters not whether Ms. Magee misinterpreted or even arbitrarily applied the Policy against Mr. Tindol.

Mr. Tindol would likely disagree because he strongly believes Ms. Magee misapplied the Policy – in his view, maliciously – against him, and he asserts that her use of the Policy constituted consideration of a "nonmerit factor." But the SPD

has never interpreted the phrase "nonmerit factor" as Mr. Tindol does.[29]  And even

if Ms. Magee's application of the Policy against Mr. Tindol constituted prohibited

discrimination on the basis of a nonmerit factor, thereby entitling Mr. Tindol to an

appellate hearing before the SPB per Rule 670-X-4-.03, he would have no redress

in this court under § 1983 for a deprivation of procedural due process because he

still has not satisfied the threshold requirement by showing that Alabama law

supports "a legitimate claim of entitlement to" his promotion within the merit

system.  *See Roth*, 408 U.S. at 577.

The court has also considered "the absurd policy implications" identified by

Defendants that would flow from a ruling in Mr. Tindol's favor.  (Doc. # 50, at 23,

23 n.5 (citing *Webster v. Redmond*, 599 F.2d 793 (7th Cir. 1979).)  Defendants

point out that judicial recognition of the property right that Mr. Tindol claims to

have in his prospective promotion would undermine the State of Alabama's

existing public employment framework wherein employees lack a property interest

in their continued employment until they complete a six-month probationary

period.   Mr. Tindol is asking the court to recognize property interests in

prospective promotions and to afford the accompanying right to an SPB hearing to

---

[29] As set out *supra* at Part III.A.2., the SPD and Ms. Graham historically have construed Rule 670-X-4-.03 narrowly to afford appellate relief only where a person has been discriminated against in violation of federal law, for example, on the basis of race or sex.  "An agency's interpretation of its own rule or regulation must stand if it is reasonable, even though it may not appear as reasonable as some other interpretation."  *Health Care Auth. of Athens & Limestone Cnty. v. Statewide Health Coordinating Council*, 988 So. 2d 574, 581 (Ala. Civ. App. 2008).

any eligible candidate in the merit system who is passed over for promotion on the basis of any "nonmerit factor," before the person ever completes his or her mandatory probation period.  Acknowledging Mr. Tindol's interest in promotion would impact thousands of persons who are on state promotional registers, and potentially thousands more who are outside of the merit system but who want to be hired.  The SPB would be inundated with requests for hearings.  It is difficult to conceive that the Alabama Legislature intended to confer these rights on current or prospective state employees when it passed the Merit System Act, created the SPD, and authorized the SPB to promulgate rules for the administration of the merit system.

For all these reasons, the result here is the same as the result in *Grant*, *Wu*, and *Oladeinde*.  Mr. Tindol lacked and lacks a protected property interest in any prospective promotion within the merit system.

### iii.    Summary of Procedural Due Process Claim

In response to Mr. Tindol's motion for partial summary judgment, Defendants go further by asserting that even if Mr. Tindol has identified a legally cognizable property interest in promotion, he cannot satisfy the third element of his claim by showing a lack of constitutional due process.  Defendants contend that Mr. Tindol had an adequate remedy in the state courts of Alabama inasmuch as he could have petitioned for a writ of mandamus.  (Doc. # 45, at 39.)  Rather than

47

pursuing this additional argument, the court rests its conclusion solely on Mr. Tindol's inability to satisfy the first element of a procedural due process claim.

Because Alabama law does not create a certain property interest in a merit system employee's prospective promotion, Mr. Tindol's motion for partial summary judgment is due to be denied and Ms. Magee and Ms. Graham's motion for summary judgment is due to be granted with respect to the procedural due process claim.

### 3.    *Immunity Defenses to State-Law Claims*

#### a.    **State-Agent Immunity**

Ms. Magee and Ms. Graham assert their entitlement to state-agent immunity on the state-law claims of negligence and breach of contract against them in their individual capacities.  (Doc. # 39, at 53–57.)  The Alabama Supreme Court has set out the doctrine of state-agent immunity as follows:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>
> . . .
>
> (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
>
> > . . . (d) hiring, firing, transferring, assigning, or supervising personnel . . . .

*Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2000) *holding modified by Hollis v. City of Brighton*, 950 So. 2d 300 (Ala. 2006).   There are, of course, exceptions where state-agent immunity is inappropriate.

> Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity
>
> . . .
>
> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Id.*

The state agent-defendant raising the immunity defense bears the burden of demonstrating that the plaintiff's claims arise from the agent's performance of discretionary functions.   *Ex parte Wood*, 852 So. 2d 705, 709 (Ala. 2002).   Once the defendant meets his or her burden, it becomes the plaintiff's burden to show that immunity should not be granted.   *Id.*   Ms. Magee and Ms. Graham argue that the conduct for which Mr. Tindol sues them falls within their discretionary authority to consider Mr. Tindol's eligibility for promotion and entitlement to a hearing before the SPB – conduct requiring them to "exercise[e] [their] judgment in the administration of [their] department or agency."   (Doc. # 39, at 55 (citing *Ex parte Cranman*, 792 So. 2d at 405).)

Mr. Tindol disputes that Ms. Magee and Ms. Graham have performed duties imposed on them by state law in the manner prescribed by the law.  *See Ex parte Cranman*, 792 So. 2d at 405 ("A State agent shall be immune . . . when the conduct . . . is based upon the agent's . . . (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner . . . .").  However, as discussed *infra* with respect to Mr. Tindol's negligence claim, neither Ms. Magee nor Ms. Graham transgressed state law or neglected their duties in their handling of Mr. Tindol's employment situation.

Mr. Tindol argues alternatively that "[t]here is ample evidence in the record" that Ms. Magee and Ms. Graham acted willfully, maliciously, fraudulently, beyond their authority, and under a mistaken interpretation of law.  (Doc. # 47, at 44.) Specifically, Ms. Magee is alleged to have applied the Policy maliciously or punitively against Mr. Tindol because of the conflict created by his hire and employment in the same department as his mother.  Similarly, Ms. Graham is alleged to have demonstrated malice and exceeded her authority by conveying Ms. Free's complaint against Holley Tindol to the Alabama Ethics Commission.  Mr. Tindol also ascribes malice to Ms. Magee and Ms. Graham because they

collaborated in denying Mr. Tindol a hearing when he first complained[30] and because they did nothing to ensure Mr. Tindol's "overdue" promotion in January 2014 after Holley Tindol had been transferred out of ADOR.  (Doc. # 47, at 45–46.)   Mr. Tindol identifies an email from Ms. Magee to a deputy ADOR commissioner about his work performance that he claims is sarcastic.  (Doc. # 47, at 31.)  Finally, Mr. Tindol claims that Ms. Graham misunderstood her legal duty to investigate Mr. Tindol's appeal and to provide him with a hearing and that Ms. Magee acted under a mistaken understanding of the state's nepotism laws.

Ms. Magee and Ms. Graham deny that Mr. Tindol's evidence supports his assertion that they should be denied state-agent immunity.  (Doc. # 50, at 49–50.)

With respect to the argument that either Ms. Graham or Ms. Magee mistakenly interpreted Alabama statutory or administrative law or willfully neglected a legal duty owed to Mr. Tindol, those questions are resolved in this opinion in Defendants' favor as a matter of law.   Regarding Mr. Tindol's averments of malice, Mr. Tindol admitted in his deposition that Ms. Graham harbors no ill will toward him.  (Pl.'s Dep. at 188–89.)  He may not contradict his testimony by claiming that Ms. Graham acted maliciously.  As for Ms. Magee, there is no doubt that Mr. Tindol subjectively believes that Ms. Magee harbored ill

---

[30] Ms. Magee and Ms. Graham met together with legal counsel to discuss Mr. Tindol's entitlement to a hearing.  (Magee Dep. at 56–57.)   Consulting lawyers in response to Mr. Tindol's complaint is not evidence of some form of conspiracy to wrong Mr. Tindol.

will toward him, but it is his burden to produce evidence of that ill will.  What he has produced is his speculative interpretation of Ms. Magee's motives over the course of her tenure in promulgating the Policy, applying it against him, and continuing to delay promotion after transferring Holley Tindol.  Speculation is not enough.  *See S.E.C. v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014) ("Speculation or conjecture cannot create a genuine issue of material fact.")

Because Ms. Magee and Ms. Graham were exercising their judgment in the administration of their duties, and because no exception to state-agent immunity applies, they are entitled to the protection of state-agent immunity on Mr. Tindol's state-law claims against them in their individual capacities.

### b.    Article I, § 14 Immunity

Ms. Magee and Ms. Graham also argue that they are entitled to immunity under Article I, § 14 of the Alabama Constitution in their individual capacities on Mr. Tindol's state-law claims for monetary damages.  (Doc. # 39, at 57–58.) "Whether immunity serves as a defense to an action against a state officer or employee sued *in his individual capacity* depends upon the degree to which the action involves a State interest."  *Ex parte Davis*, 930 So. 2d 497, 500 (Ala. 2005) (emphasis added).  The Alabama Supreme Court "has consistently held that a claim for monetary damages made against a constitutional officer in the officer's individual capacity is barred by State immunity whenever the acts that are the basis

52

of the alleged liability were performed within the course and scope of the officer's employment." *Id.* at 500–01.

Mr. Tindol says that a state official like Ms. Magee or Ms. Graham may be compelled to perform "legal duties" or "ministerial acts" required by state statutes and rules notwithstanding Article I, § 14 immunity, (Doc. # 47, at 46), but his response ignores the nature of the relief he requests in his Complaint (monetary damages) as well as the basis for the defense as Ms. Magee and Ms. Graham have raised it (a bar against the imposition of monetary damages). There is no dispute that Ms. Magee and Ms. Graham are constitutional officers and that the acts at the basis of their alleged liability were performed within the scope of their official duties.

The court concludes that Ms. Magee and Ms. Graham are each entitled to state sovereign immunity per Article I, § 14 on Mr. Tindol's state-law claims for monetary damages against them in their individual capacities. Alternatively, Ms. Magee and Ms. Graham are without the need for an immunity defense because Mr. Tindol's state-law claims fail on their merits.

### 4.   *Merits of State-Law Claims*

#### a.   **Negligence**

To establish a claim for negligence, the plaintiff must establish:  (1) that defendant owed a duty to the plaintiff; (2) that defendant breached that duty;

(3) the existence of proximate causation; and (4) damage or injury. *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994). Ms. Magee and Ms. Graham protest that no one owed Mr. Tindol a duty to promote him or to provide a hearing once he was denied promotion. (Doc. # 39, at 46, 48–49.)[31] Mr. Tindol responds that the same provisions of statutory and administrative law, discussed in association with the alleged procedural due process violation, *see supra* at Part IV.C.2.b., imposed a duty upon: (1) Ms. Magee to promote Mr. Tindol on the basis of merit and competition and without regard to her belief that promotion would offend the Policy; and upon (2) Ms. Graham to "investigate" and provide a hearing when Mr. Tindol's promotion was declined on the basis of a "nonmerit" factor. (Doc. # 47, at 39–40.)

Defendants acknowledge that violations of statutes and ordinances may constitute negligence *per se*, but they contend that to prove negligence *per se*, the plaintiff must show:

> (1) that the statute the defendant is charged with violating was enacted to protect a class of persons to which the plaintiff belonged; (2) that the plaintiff's injury was the kind of injury contemplated by the statute; (3) that the defendant violated the statute; and (4) that the defendant's violation of the statute proximately caused the plaintiff's injury.

---

[31] Defendants further argue that even if there was a State policy requiring a hearing after declining to promote an employee, that policy would not create a legally enforceable duty. (Doc. # 39, at 47.)

*Dickinson v. Land Developers Constr. Co.*, 882 So. 2d 291, 302 (Ala. 2003).  The

first requirement – legislative intent to protect a particular class of persons – cannot

be satisfied where a statute or ordinance is enacted for the benefit of the general

public.  *Thomas Learning Ctr., Inc. v. McGuirk*, 766 So. 2d 161, 171–72 (Ala. Civ.

App. 1998); *see also* Restatement (Second) of Torts § 288 (1965) (requiring that

statutory standard not be adopted as standard of care where the statute or

regulation's purpose to protect the interests of the state).  Defendants note that the

Merit System Act was enacted expressly for the benefit of "all citizens," *see* Ala.

Code § 36-26-3, and that § 41-1-5's restrictions are for the benefit of the state and

public at large rather than any specific class of persons, *see Opinion of the Justices*,

285 So. 2d 87, 90 (1973) ("[T]he intent and purpose of the statute is to prohibit the

appointment or employment by the appointing authority of persons related to him

who will serve in subordinate jobs, positions or offices of profit in the State

government.").  Defendants' position is well taken.

Defendants do not address directly whether Ms. Graham neglected a duty

imposed by Rule 670-X-4-.03 by declining Mr. Tindol's request for a hearing, but

that rule has been interpreted historically as being for the specific benefit of

persons who believe they have been discriminated against in violation of federal

law.  Mr. Tindol denies that he falls into that category, and the SPD's interpretation

of the rule is entitled to deference.  Ergo, to the extent that Mr. Tindol asserts a negligence *per se* claim for violation of Rule 670-X-4-.03, that claim must fail.

Even if Mr. Tindol could show that the statutes and rules he cites were enacted for his protection as opposed to the protection of the public or the state, he still cannot show that Defendants violated a duty imposed upon them by those statutes or rules.  *See supra* Part IV.C.2.b.ii.

In sum, because neither Ms. Magee nor Ms. Graham owed Mr. Tindol a duty under Alabama law to promote him or to provide him with a hearing before the SPB, they are entitled to summary judgment on Mr. Tindol's negligence claim.

### b.    Breach of Employment Contract

Under Alabama law, a breach of contract claim requires (1) a valid binding contract; (2) the plaintiff's performance; (3) the defendant's nonperformance; and (4) resulting damages.  *Benton v. Clegg Land Co.*, 99 So. 3d 872, 883 (Ala. Civ. App. 2012).  Defendants contend that ADOR does not enter contracts with its employees and that ADOR's employee handbook, which does not even address promotion, does not meet the definition of a contract under Alabama law because it reserves the right to unilaterally change the handbook's policies.  (Doc. # 39, at 50–52.)  Further, Ms. Magee and Ms. Graham note that neither of them has personally entered any contract with Mr. Tindol.  (Doc. # 39, at 52.)

Mr. Tindol contends that "statutes and rules" – presumably but not decidedly the same ones discussed previously with respect to his procedural due process claim – "confer contract status between [himself] and Defendants where they have adopted, but failed to abide by, [those] rules governing the provision of a promotion." (Doc. # 47, at 40–41.)  Mr. Tindol further claims that Ms. Magee's non-compliance with the Policy itself supports his breach of contract claim. (Doc. # 47, at 41.)  He relies upon *Belcher v. Jefferson County Board of Education*, 474 So. 2d 1063, 1068 (Ala. 1985), where the court reinstated the plaintiffs' breach of contract claim on the basis of the defendant school board's institution of and noncompliance with a teacher evaluation policy.  The *Belcher* court reasoned that the school board "did not legally have to follow any particular evaluation policy absent its own self-imposed procedures," but "[h]aving adopted a policy, however, the Board [wa]s bound to follow it."  *Id.*

Alternatively, Mr. Tindol argues that Mr. Ball's oral representations that the Policy would not bar Mr. Tindol's promotion within ADOR, supported by Mr. Ball's authority to discuss and explain the Policy to Mr. Tindol, is sufficient to create an enforceable contract "not to deny [Mr. Tindol] a promotion where the reporting structure [within the IT Division] did not change." (Doc. # 47, at 41–42 (citing *Goodyear Tire & Rubber Co. v. Portilla*, 879 S.W.2d 47, 50 (Tex. 1994)). In *Goodyear*, the court found that the defendant wrongfully terminated an at-will

employee for violation of the defendant's anti-nepotism policy because the company had waived its anti-nepotism policy and created an enforceable right in favor of the plaintiff.

In reply, Defendants first emphasize their prior contention that there are no facts to suggest that Ms. Magee, Ms. Graham, or the SPD is in any way privy to an alleged contract benefiting Mr. Tindol.  Defendants contend that Mr. Tindol has not and cannot show that any state statute creates an enforceable contract right. Even if he could – and he cannot, for reasons discussed *supra* – "state statutory enactments [normally] do not of their own force create a contract with those whom the statute benefits" unless there is evidence of an "unmistakable" intent by the legislature to bind itself contractually.  *Taylor v. City of Gadsden*, 958 F. Supp. 2d 1287, 1321 (N.D. Ala. 2013) *aff'd,* 767 F.3d 1124 (11th Cir. 2014).

With respect to Mr. Tindol's contention that his contract claim arises from either Mr. Ball's oral assurances or Ms. Magee's alleged non-compliance with the Policy, Defendants posit that Mr. Tindol "attempts to change legal theories and allege new facts." (Doc. # 50, at 44.)  In the Complaint, Mr. Tindol does not allege that oral representations or conduct created an enforceable contract.  He does allege that he "was assured that he could be promoted" notwithstanding the Policy because his mother was not in his chain of command and because of the grandfather proviso.  (Compl. at ¶ 19.)  But with respect to his breach of contract

claim, he alleges that the State's policies, procedures, and the handbook "create a binding unilateral contract between Plaintiffs [sic] and the State." (Compl. at ¶¶ 76–77.) Defendants argue that Mr. Tindol failed to offer fair notice of the nature of the contract claim he is now advancing, and thus, that he may not amend his complaint through his summary judgment briefing.[32]

Again, Mr. Tindol is bound to the complaint that he pleaded and which he chose not to amend, and he may not change the theories upon which he seeks relief through summary judgment briefing. *See Gilmour*, 382 F.3d at 1315. Upon consideration of Defendants' arguments in favor of summary judgment on the breach of contract claim presented in the Complaint, the court finds that summary judgment is due to be granted in favor of Ms. Magee and Ms. Graham because there is no evidence of an enforceable contract in Mr. Tindol's favor with either Ms. Magee or Ms. Graham.

D.     **Motion to Strike and Objections**

Because the case is due to be dismissed at summary judgment, Defendants' motion to strike and objections to Mr. Tindol's pretrial order contentions (Doc. # 58) are due to be denied and overruled as moot.

---

[32] Defendants note that if the Complaint had given notice of this theory of contract, they would have pleaded the statute of frauds as an affirmative defense. (Doc. # 50, at 46 n.11.)

## V.  CONCLUSION

As indicated by the parties on the record at the pretrial conference, the outcome in this case means a great deal to everyone involved.  Defendants seek to ensure that their legal duties are not expanded, and they have succeeded.  Mr. Tindol seeks to vindicate his perceived right to a promotion for a job well done. He has, without the assistance of a court, obtained the promotion he coveted, and he can hopefully move ahead with his career.  Interestingly, neither party gets the satisfaction of a ruling that Mr. Tindol's former situation was or was not subject to ADOR's Policy.  The dissatisfaction that this may bring Mr. Tindol is a reminder that many disagreements between state agencies and their employees simply cannot be remedied by federal lawsuits.

On the basis of the foregoing analysis, it is ORDERED that:

(1)    Defendants' motions for summary judgment (Docs. # 30, 32, 34) are GRANTED as to all of Plaintiffs' federal-law and state-law claims;

(2)    Plaintiffs' motion for partial summary judgment (Doc. # 35) is DENIED;

(3)    Defendants' objections and motion to strike (Doc. # 58) are OVERRULED AS MOOT and DENIED AS MOOT, respectively.

A separate final judgment will follow.

DONE this 23rd day of January, 2015.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE